# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
## AT NASHVILLE
### Assigned on Briefs January 16, 2013

## STATE OF TENNESSEE v. MANSOUR BIN EL AMIN

**Appeal from the Circuit Court for Montgomery County**
**No. 41100797   Michael R. Jones, Judge**

---

**No.  M2012-01261-CCA-R3-CD - Filed May 31, 2013**

---

The Defendant, Mansour Bin El Amin, appeals from his conviction by a Montgomery County Circuit Court jury for theft of property valued at more than $1000, a Class D felony. *See* T.C.A. § 39-14-103 (2010). The trial court sentenced the Defendant as a Range II, multiple offender to seven years, six months' confinement. The Defendant contends that the evidence is insufficient to support his conviction. We affirm the judgment of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Circuit Court Affirmed**

JOSEPH M. TIPTON, P.J., delivered the opinion of the court, in which JAMES CURWOOD WITT, JR., J., and PAUL G. SUMMERS, SR.J., joined.

James Roberts Potter, Clarksville, Tennessee, for the Defendant, Mansour Bin El Amin.

Robert E. Cooper, Jr., Attorney General and Reporter; Rachel Harmon, Assistant Attorney General; John Wesley Carney, Jr., District Attorney General; and Helen Owsley Young, Assistant District Attorney General, for the appellee, State of Tennessee.

## OPINION

At the trial, Laurien McDowell, the victim, testified that she lived alone in a duplex apartment on June 18, 2011, but that she left for the night. She said that no one was inside her apartment when she left and that she locked the doors. She said she returned home around 7:00 the next morning and found her back door open. She said her flat screen television, XBox, watch, jewelry, laptop, and all her DVDs were missing. She said the laptop was worth about $120, the television about $350, the four missing jewelry chains at least $115 each, and the Xbox $300. She said that her bathroom window was open but that she had not left it open. She said she went to her neighbor's house and called the police.

The victim testified that her neighbor told her about someone who had been to the neighbor's apartment. She said she did not know the Defendant and had not heard his name before speaking with her neighbor. She said she did not give the Defendant permission to be in her home or to take her property. She said that she did not know Daniel and Janazea West but that Ms. West called her the morning she discovered her property missing. She said Ms. West told her that Mr. and Ms. West had her television and were bringing it to her. The victim said they also returned her watch. She said all her property except her laptop was returned after the police found it.

The prosecutor introduced a series of photographs as exhibits. The victim said that in one photograph, her Xbox was shown on the seat of a car she did not recognize. She said that all her DVDs, some of her game controllers, and some of her jewelry were shown in another photograph and that the property was hers and was taken from her apartment. She said she did not know any of the people connected to the case other than her neighbor.

Mikia Jackson testified that she lived with her fiancé and her son in the apartment connected to the victim's apartment. She said that on June 18, 2011, her son and her sister were home with her and that she had visitors around 10:00 or 11:00 that night. She said Janazea West, Daniel West, and the Defendant were her neighbors at a previous apartment on Alma Lane. She said that the Defendant and Ms. West referred to each other as brother and sister but that they were not siblings. She said that she had a few conversations with the Defendant at her apartment on Alma Lane but that they did not socialize. She said that the Defendant did not know where she moved but that Mr. and Ms. West previously brought her fiancé to her new address and knew where she lived.

Ms. Jackson testified that the Defendant came to her house on the night of June 18, 2011, and asked to use her telephone. She said she let him use the phone because she recognized him. She said that he did not tell her why he needed to use the phone and that she was surprised to see him. She said that it was dark outside when the Defendant knocked, that she did not see him come to the door, and that she did not see a car outside. She said that the house was on a "tiny" road with "one way in and one way out" and that two cars could not pass each other on it. She said that she did not hear the Defendant have a conversation with anyone on the phone and that after he used the phone, he left. She said she did not hear anything unusual.

Ms. Jackson testified that she heard the victim yelling and crying the next morning and that the victim knocked on her door around 6:00 a.m. She said that after she saw the victim's bathroom window had been pried open, she called Ms. West and told the victim someone had used her phone the previous night.

Ms. Jackson testified that the Defendant was "nice and sweet" and that she had never had a problem with him. She said that Ms. West and the Defendant had a close relationship and that Ms. West took care of the Defendant.

On cross-examination, Ms. Jackson testified that there were more than a few houses on the road to her house. She said that the Defendant had never been to her house but that he knocked on her door at 10:00 or 11:00 that night. She said that the Defendant used her telephone, that the person he called did not answer, and that he hung up and left. She said she did not see him after he left. She said she was in her living room sitting beside the door when the Defendant knocked. She believed the Defendant walked that night and said it took about fifteen minutes to walk from her previous apartment on Alma Lane to her duplex apartment. On redirect examination, Ms. Jackson clarified that there were only three occupied buildings on the road where her apartment was located and that she was referring to the main road leading to her road when she told defense counsel there were more than a few houses there.

Daniel West testified that he was married to Janazea West. He said that he had known the Defendant about three years and that they were friends. He said that the Defendant lived with him, his wife, and his eight-year-old daughter in an apartment on Alma Lane on June 18 and 19, 2011. He said that he was on "good terms" with the Defendant in June 2011 and that he had never had a "falling out" with the Defendant. He said that while he was incarcerated for drug charges, his wife allowed the Defendant, a former neighbor, to stay at their apartment.

Mr. West testified that he and his wife were home on the night of June 18, 2011, and that the Defendant was there between 6:00 and 10:00 p.m. He said that he saw the Defendant before he went to bed around 10:00 p.m. and that the Defendant was not locked out of the house that night. He said he used the restroom around 12:30 a.m. and noticed a television on the couch but did not see the Defendant. He said that when he woke the next morning around 6:00, a television was on the couch and that the Defendant was there. He asked the Defendant where he got the television, and the Defendant told him that he "had made a lick." He said he understood "made a lick" to mean a "robbery" or a "sting." He said that his wife also questioned the Defendant. He said they called Detective Newman and met the detective and the television's owner at the duplex to return the television. He said he had no reason to get the Defendant into trouble or lie about him.

On cross-examination, Mr. West testified that the Defendant did not have a key to his apartment. He said he was in jail for marijuana when the Defendant moved into his apartment. He said he did not know why he did not mention his waking to use the restroom and seeing the television on the couch around 12:30 a.m. in his written statement to Detective

Newman. He said he did not call Detective Newman but met him at the apartment where the burglary occurred. He said that he took the television out of his apartment, placed it in his car, and drove to the victim's apartment. He said he did not call the police when he found the stolen television in his apartment because his wife was talking to the owner on the telephone and they decided to return the television rather than have the police come to their apartment.

On redirect examination, Mr. West testified that he did not want to give a statement to Detective Newman about the Defendant. He said he tried to avoid writing the statement and kept what he wrote to a minimum because the Defendant was a friend.

Janazea West testified that she was married to Daniel West and that they lived in an apartment on Alma Lane. She said that she thought she knew the Defendant pretty well, that she had known him three or four years, and that she met him at a previous address. She said she knew Mikia Jackson because Ms. Jackson lived with relatives who were Ms. West's neighbors on Alma Lane. She said that she and Ms. Jackson were acquaintances and that she spoke to Ms. Jackson or played with Ms. Jackson's son if she saw them outside. She said that the Defendant was living with her when she met Ms. Jackson but that the Defendant and Ms. Jackson were not close friends. She said that Ms. Jackson moved to a different location and that although she knew the general area, she had not been to the house. She said that when she and her husband returned the television, she did not go to the house because the police arrived at the end of the driveway and her car sat too close to the ground to travel on the gravel driveway without causing damage. She said that when she woke, she had a text message from Ms. Jackson asking what property she had at her house. She said she told Ms. Jackson that she would return the television and that she did not know it was there until she woke that morning. She said the police did not contact her before she returned the television.

Ms. West testified that she had three missed calls from an unfamiliar number when she woke that morning and that she received the text messages as she was returning the missed calls. She said that she took sleep medication at night and that her phone was set to vibrate, not ring. She said she told Ms. Jackson that a television was in her closet and that her husband told her a watch was there. She did not remember if the Defendant was standing there when she spoke to her husband. She said she did not know when the television was put in the closet.

Ms. West testified that when she woke that morning, she went to the store with the Defendant. She said that during the ride, the Defendant told her he "made a lick." She told him that he would have to take the property out of her house. She said she then received the phone calls and text messages. She said that she told Ms. Jackson she would return the property and that she did not wait before responding to the messages and calls because the

police were involved. She said that she and the Defendant were close and that the Defendant referred to her as "Sis." She said Detective Newman asked her to write a statement. She said she did not want to write the statement but did what she had to do.

Ms. West testified that she did not know where Ms. Jackson lived. She said that to her knowledge, the Defendant had not been to Ms. Jackson's apartment other than to use the phone on the night in question. She said she did not know many people in her apartment complex. She said she did not know whom the Defendant knew in the area but knew he was outside more than she was. She said the Defendant sometimes visited the neighbor upstairs. She said that if the Defendant was locked out of her apartment on the night in question, she was not aware of it because he was in the living room when she went to bed and could come and go as he pleased. She said he did not have a key to the apartment.

Ms. West testified that when the Defendant lived with her, she cooked and cleaned for him, washed his clothes, and paid for the food. She said she treated him like a brother and never had a cross word with him. She said she had no reason to lie and would rather protect him if she could. She said the Defendant babysat her daughter sometimes. She said she would not lie to protect Quinton Banks or Brooks Robinson. She said that she had seen the Defendant in a crowd of boys with Mr. Robinson and that the Defendant "hung with Nana," who was a friend of the upstairs neighbor the Defendant visited. She said that when she confronted the Defendant about the stolen television, he was terrified, acted nervous, and kept saying he was going to jail. She said she did not want anyone to go to jail.

On cross-examination, Ms. West testified that she tried to be a good citizen and that she allowed the Defendant to move into her apartment while her husband was in jail because the Defendant was a friend and needed somewhere to stay. She said that Jermez Hardy was her brother and that he lived in her apartment on June 18, 2011. She said that she woke around 5:30 or 6:00 a.m. and that the television was in her closet. She said she asked her husband if he knew anything about the television. She said she did not call the police because Ms. Jackson told her the police were already involved and she did not believe more officers were needed. She agreed that she woke and found the stolen property in her house, placed the property in her car, and took it to its owner. She said that she did not touch the television, that she did not think her husband touched it, and that they had the Defendant place the television in their car to avoid leaving their fingerprints on it. She said that Detective Newman removed the television from her car when they returned it. She said she had a missed call from Ms. Jackson when she woke. She said she was alone in her car with the Defendant when he told her he "made a lick."

Clarksville Police Detective Brian Gus Tenery testified that he was working as a patrol officer in June 2011 and was dispatched to the duplex on June 19, 2011, for a burglary.

He said he arrived at the scene, spoke with the victim, took the initial report, and wrote a list of missing property. He said that he spoke with Ms. Jackson and that although she could not provide a name, she gave a description of the Defendant and a description of where she believed the Defendant lived on Alma Lane. He went to Alma Lane and found an older two-door, red car parked in front of the one-story building. He said he looked into the car and saw an Xbox 360 with a red controller and an extra cord matching the description the victim gave. He said that when he was recovering the property from the car, he found a plastic garbage bag on the floorboard containing Xbox games and DVDs. He said that he initially checked the area where he found the red car because of the description Ms. Jackson gave and that he also looked in the windows of other cars.

On cross-examination, Detective Tenery testified that he ran a "check" on the red car but did not remember who owned it. He said that he was at the scene for approximately one hour and that he saw the property as it was recovered. He said he did not participate in the questioning of the owner of the car. He said the Defendant approached him outside. The Defendant told Detective Tenery that he was the person for whom they were looking but did not say why.

Qwentin Banks testified that he was living with a friend, "Poo," on Alma Lane in July 2011. He said that because his car was being repaired at the time, he drove a 1988 Cutlass, which belong to his cousin Demarcus Reyes. He said that on the morning of June 19, 2011, the car was parked in front of the apartments and was there all day because he did not have any gas. He said that the car was kept unlocked because he did not have a key and that the ignition was "rigged up" to start without a key. He said he had seen the Defendant before but neither saw him on the night of June 18 nor took him anywhere that night. He said that the property in the plastic garbage bag was found in his car but that it was not there when he parked the previous day. He said he did not place the property in his car, did not give permission for anyone to place it there, and never touched the garbage bag or the property. He said he did not know Brooks Robinson. He said that he did not give anyone permission to drive his car that night and that it had been parked all night.

On cross-examination, Mr. Banks testified that he did not know the Defendant and that the Defendant had no reason to place stolen property in his car. He said Mr. Robinson, whom he did not know, had never ridden in his car. He agreed that he had been convicted of theft and that he was on probation at the time of the trial. He said that he was in Poo's apartment when the police called him. On redirect examination, Mr. Banks stated that his theft conviction was a misdemeanor and that he had paid restitution. He said he gave the police permission to search his car because he had nothing to hide.

Clarksville Police Detective Nicholas Newman testified that he had worked for the police department for fourteen and one-half years and had been a detective for thirteen and one-half years. He said that he was the lead investigator assigned to this case and that he spoke with the Defendant between 11:00 a.m. and noon on June 18, 2011. He said that Mr. and Ms. West were cooperative and that he had no reason to suspect they were responsible for stealing the television. He said that they did not have to return the television and that he did not think he would have found it had they not. He said they also returned a watch identified by the victim. He said the watch, the television, and the property found in the car were identified by the victim and returned to her.

Detective Newman testified that other than finding the property in Mr. Banks's car, no evidence indicated he was involved in the burglary. He said Mr. Banks was cooperative and allowed the police to search his car. He said he searched the car and verified Mr. Banks's story that the doors could not be locked or unlocked.

Detective Newman testified that the burglary was discovered at 7:30 a.m. and that he first spoke to the Defendant in his office between 10:00 and 11:00 a.m. He said the Defendant agreed to talk to him and signed his waivers. He said the Defendant told him that he was locked out of his apartment on Alma Lane, that he went to Ms. Jackson's apartment to use her phone, and that he received a ride from "Q" to Ms. Jackson's apartment. Detective Newman said the Defendant knew the property was found in Mr. Banks's car when the Defendant told Detective Newman that he rode with Q. He said the Defendant told him that he was not able to contact his sister when he called her and that he rode home with Q.

Detective Newman testified that the Defendant made no admission regarding the burglary. He said the Defendant told him he found the television in a vacant apartment next door and denied it was ever in Mr. and Ms. West's apartment. He said that when he asked the Defendant why he thought he was at the police station, the Defendant told him that he "figured it had something to do with the break-in" because he tried to help a lady retrieve her television. He said the Defendant told him that he was at Ms. Jackson's apartment around 10:00 p.m. The Defendant also told Detective Newman that he and Ms. West were good friends and that she was not a liar. The Defendant did not make allegations against Mr. West. Detective Newman said the Defendant did not mention Brooks Robinson and did not know what Q had done other than give him a ride. He said that the Defendant told him to check the plastic garbage bag found in the car for fingerprints and that he sent the bag to the Tennessee Bureau of Investigation (TBI) for testing. He said Detective Nolder lifted latent fingerprints from the television and sent them to TBI. He said the Defendant acted as if he knew Ms. Jackson and went to her house to use the phone because he knew her.

On cross-examination, Detective Newman testified that normally when he found someone in possession of stolen property, he focused on him or her as a suspect. He said, though, that once he learned Mr. Banks's car doors would not lock, he thought it was possible someone else placed the property in Mr. Banks's car. He said Mr. Banks did not know the Defendant. He admitted he did not know why the Defendant would place stolen property in a stranger's car. He said the Defendant's fingerprints were not found on the television, the Xbox, the DVDs, or anywhere in the victim's apartment. He admitted that no one saw the Defendant in the apartment and that the Defendant denied ever being in the apartment.

Detective Newman testified that he considered Mr. Banks a suspect but eliminated him after finding his car in front of his apartment with locks that did not work and after no one informed him Mr. Banks was seen at the duplex. He said he spoke to the victim but not to Ms. Jackson when he was at the duplex. He said that the television may have been thirty-two inches and that the duplex was about one-half mile from the Alma Lane apartment. He agreed that it would be difficult for the Defendant to carry a thirty-two inch television, an Xbox, and sixty-one DVDs in one trip for one-half mile but denied it would be impossible. He agreed that Old Ashland City Road, the road between the two apartments, was a busy road. He said he did not believe the Defendant went to the duplex in a car. He was not aware the Defendant received Social Security checks.

On redirect examination, Detective Newman testified that the Defendant was staying with Mr. and Ms. West to establish a residence in order to apply for Social Security Disability but had not begun receiving the benefits when he was arrested. He said smudged fingerprints were found on the television. He said that in his experience, burglars normally wore gloves but may get "sloppy." He said that it was not customary for someone in possession of stolen property to give permission to search his car and that Mr. Banks's consent to search influenced his belief about whether Mr. Banks should be further investigated. He said that the Defendant told him Mr. Banks drove him to the duplex to make a phone call but that Ms. Jackson told him she did not see headlights that night. The Defendant told him that Mr. Banks drove to the duplex and sat in the dark with the headlights on. Detective Newman said he measured the distance between the duplex and the Alma Lane apartment, which was six-tenths of one mile. He said the portion of Ashland City Road where the Defendant carried the stolen property was not well lit and typically did not have heavy traffic between 11:00 p.m. and 1:00 a.m. He said that the television did not weigh much and that the garbage bag of DVDs did not weigh more than thirty pounds.

On recross-examination, Detective Newman testified that the Defendant told him "Q" gave him a ride but that during his redirect examination, Detective Newman said "Qwentin" gave the Defendant a ride. He said that he did not believe the Defendant was in Mr. Banks's

car and that Mr. Banks denied knowing the Defendant. He said that Ashland City Road had less cars than Fort Campbell Boulevard and Riverside Drive and that although there were street lights, Ashland City Road was not well lit.

TBI Special Agent J.E. Reed performed the fingerprint analysis in the case but was unavailable to testify due to illness. The parties stipulated that Agent Reed was an expert in the area of fingerprint identification and comparison and that if she were available, she would testify to the contents of the report, which was entered as an exhibit.

TBI Special Agent Harry Woods testified that he was a forensic scientist specializing in fingerprint identication and comparison and that he was Agent Reed's colleague. He said that he reviewed Agent Reed's notes and report and that according to her report, there were four identifiable latent prints on the garbage bag found in the car. He said the Defendant's and the victim's fingerprint impressions were sent to the TBI for comparison. He said one of the latent prints found on the garbage bag belonged to the Defendant. He said that Agent Reed searched for a match for the other three prints in "AFIS," a computer database, and found that they belonged to Brooks Alonzo Robinson. He said no identifiable latent prints were found on the television.

Detective Newman was recalled by the State and testified that he sent the plastic garbage bag found in Mr. Banks's car to the TBI for fingerprints analysis. On cross-examination, he said he knew someone placed the garbage bag in the car but did not compare the bag found in the car to the garbage bags in the victim's apartment. He said that this case was set for trial before he received the results stating that Mr. Robinson's fingerprints were on the bag but that the fingerprints did not change his opinion of this case. On redirect examination, he said that the presence of Mr. Robinson's fingerprints made him believe that someone else could have been involved and that he was attempting to locate and investigate Mr. Robinson at the time of the trial.

Janazea West testified for the defense that the Defendant's mother sent his medical records to her house when he was living there and that a folder was still there. She said she did not know if his birth certificate and Social Security card were in the folder. She said that the Defendant had not received a Social Security check, that a transportation check had been mailed to her house, and that she returned the envelope to the sender. On cross-examination, Ms. West said that the Defendant had a government-issued cell phone when he lived with her, which he used occasionally. She said he did not have to go elsewhere to call her.

Daniel West testified for the defense that he was released from jail on April 4, 2011, about two months before the June 18 incident. He said the television was on the couch when he woke. He stated that the Defendant was in his apartment when the Defendant said he "hit

a lick" and that Ms. West was in the bed when the Defendant made the comment. He said that the Defendant received a check in the mail a couple of days after being arrested but that Ms. West returned it to the sender. On cross-examination, Mr. West said that the Defendant received only that check and that he and his wife did not receive any benefit from the Defendant's going to jail.

The jury found the Defendant guilty of theft of property valued at more than $1000. After a sentencing hearing, the trial court sentenced the Defendant to seven years, six months' confinement. The Defendant has appealed.

**I**

The Defendant contends that the evidence is insufficient to support his conviction because he was not in possession of any of the stolen property. He argues that the evidence proved mere constructive possession of the television because Ms. West possessed and returned the television and the watch and the testimony showed the property was in Mr. and Ms. West's apartment. He argues that although the jury did not make specific findings about what property he took, it must have found that he took some of the property found in Mr. Banks's car to reach the total value of more than $1000. He argues that there is insufficient evidence for the jury to infer he exercised control over any of the property found in Mr. Banks's car other than the garbage bag because no witness placed him in or near the car and no fingerprints were found on any of the property. He also argues that because the evidence shows the value of the stolen property he actually or constructively possessed was less than $1000, the evidence was insufficient to prove he was guilty of theft of property valued at more than $1000.

Our standard of review when the sufficiency of the evidence is questioned on appeal is "whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319 (1979). We do not reweigh the evidence but presume that the trier of fact has resolved all conflicts in the testimony and drawn all reasonable inferences from the evidence in favor of the State. *See State v. Sheffield*, 676 S.W.2d 542, 547 (Tenn. 1984); *State v. Cabbage*, 571 S.W.2d 832, 835 (Tenn. 1978). Questions about witness credibility are resolved by the jury. *See State v. Bland*, 958 S.W.2d 651, 659 (Tenn. 1997).

"A crime may be established by direct evidence, circumstantial evidence, or a combination of the two." *State v. Sutton*, 166 S.W.3d 686, 691 (Tenn. 2005) (quoting *State v. Hall*, 976 S.W.2d 121, 140 (Tenn. 1998)). Circumstantial evidence alone may be sufficient to support a conviction. *State v. Richmond*, 7 S.W.3d 90, 91 (Tenn. Crim. App.

1999); *State v. Buttrey*, 756 S.W.2d 718, 721 (Tenn. Crim. App. 1988). The standard of proof is the same, whether the evidence is direct or circumstantial. *State v. Dorantes*, 331 S.W.3d 370, 379 (Tenn. 2011). Likewise, appellate review of the convicting evidence "'is the same whether the conviction is based upon direct or circumstantial evidence.'" *Id.* (quoting *State v. Hanson*, 279 S.W.3d 265, 275 (Tenn. 2009)).

Relevant to the Defendant's case, "[a] person commits theft of property if, with intent to deprive the owner of property, the person knowingly obtains or exercises control over the property without the owner's effective consent." *See* T.C.A. § 39-14-103(a) (2010). Theft of property is a Class D felony if the value of the property taken is $1000 or more but less than $10,000. *See id*. § 39-14-105(a)(3).

Actual possession occurs when a person "knowingly has direct physical control over a thing, at a given time." *State v. Edmondson,* 231 S.W.3d 925, 928 (Tenn. 2007) (citing *Black's Law Dictionary* 1163 (6th ed. 1990)). Constructive possession occurs when a person "knowingly has both the power and the intention at a given time to exercise dominion or control over a thing, either directly or through another person or persons." *Id.* "Control" means to "exercise power or influence over" an item. *Black's Law Dictionary* (9th ed. 2009).

In the light most favorable to the State, the evidence was sufficient for the jury to find beyond a reasonable doubt that the Defendant exercised control over all the stolen property. The victim testified that her flat screen television, XBox, watch, jewelry, laptop, and DVDs were stolen on June 18, 2011. Her value of the stolen items was $1230. She said she did not know the Defendant and did not give him permission to be in her home or to take her property. When Mr. and Ms. West woke on June 19, 2011, they found the television in the apartment they shared with the Defendant and returned the property to the victim. The Defendant told them that morning he "made a lick," which Mr. West said meant that the Defendant performed a "robbery."

On the morning of June 19, 2011, Ms. Jackson gave Detective Tenery a description of the Defendant and a description of where she believed the Defendant lived on Alma Lane because the Defendant had been to her apartment beside the victim's to use the phone on the night of June 18. Detective Tenery went to the Alma Lane apartment, found an older two-door, red car parked in front, and saw an Xbox 360 with a red controller and an extra cord matching the description given by the victim. When he recovered the property from the car, he found a plastic garbage bag on the floorboard containing Xbox games and DVDs. Qwentin Banks lived with a friend in an apartment on Alma Lane in 2011, and his car was parked in front of his apartment on June 19, 2011. The car doors would not lock, and he did not have a key to the car. Mr. Banks did not know the Defendant, did not take him anywhere on June 18, 2011, did not place the stolen property in his car, did not give permission for

anyone to place the property in his car, and never touched the garbage bag or the property. Detective Newman sent the bag from Mr. Banks's car to the TBI to be tested for fingerprints. Agent Reed's reports showed that the Defendant's fingerprint was found on the bag. We conclude that a rational trier of fact could find beyond a reasonable doubt the elements of theft of property valued at more than $1000.

Regarding the Defendant's argument that he only constructively possessed the television and the watch found in Mr. and Ms. West's apartment, the statute does not require possession but requires that the Defendant knowingly obtained or exercised control over the property without the owner's consent. *See* T.C.A. § 39-14-103(a). Mr. and Ms. West said that the Defendant told them he "hit a lick" and that the television and the watch were in their apartment when they woke on June 19, 2011. The victim identified the television and the watch as some of the property taken without her consent on June 18, 2011. A rational trier of fact could find beyond a reasonable doubt that the Defendant obtained or exercised control over the stolen watch or television.

Regarding the Defendant's argument that the evidence is insufficient to prove he possessed the property in Mr. Banks's car, Agent Reed identified the Defendant's fingerprint on the plastic garbage bag containing the stolen property. Mr. Banks's car doors did not lock. Detective Newman testified that in his experience, burglars normally wore gloves to avoid leaving fingerprints but may not wear them after leaving the scene. A rational trier of fact could find beyond a reasonable doubt that the Defendant obtained or exercised control over the stolen property found in Mr. Banks's car. We conclude that the evidence is sufficient to support the Defendant's conviction.

In consideration of the foregoing and the record as a whole, the judgment of the trial court is affirmed.

_____
JOSEPH M. TIPTON, PRESIDING JUDGE